UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| THE ANTWERP EXCHANGE BANK COMPANY,<br><br>Plaintiff<br><br>v.<br><br>FISERV SOLUTIONS, LLC f/k/a FISERV SOLUTIONS, INC. AND FISERV, INC.,<br><br>Defendants | Case No.: 3:26-cv-02648-JRK<br><br>**JURY TRIAL DEMANDED** |

# COMPLAINT FOR TRADE SECRET MISAPPROPRIATION

Plaintiff The Antwerp Exchange Bank Company ("**AEB**"), by its attorneys NERKO PLLC, Hecht Partners LLP, and Ogletree, Deakins, Nash, Smoak & Stewart, P.C., sues defendants Fiserv Solutions, LLC f/k/a Fiserv Solutions, Inc. ("**Fiserv Solutions**") and Fiserv, Inc. (collectively, "**Fiserv**") and alleges:

## PRELIMINARY STATEMENT

1. Fiserv sold itself to AEB as a trusted custodian of the most sensitive data a financial institution can hold: consumers' transaction histories, account numbers, and personal information. That data—AEB's own, non-public compilation of its customers' identities, account records, and financial histories—is AEB's trade secret. Fiserv obtained it by representing, in the Master Agreement and in a steady stream of security assurances, that it would guard the data with the same safeguards it uses for its own information and in compliance with federal cybersecurity standards. Without these representations, AEB would not have entrusted its trade secrets to Fiserv.

2. Those representations were false. Fiserv delivered and operated systems so deficient that no bank should be forced to run customer data through them. Fiserv's systems lack

basic security controls. They expose customer information to easy compromise. They allow hackers to steal staggering amounts from financial institutions. Yet Fiserv continued to sell these systems to financial institutions and operate them, while falsely assuring AEB and other Fiserv customers that everything was secure.

3. Fiserv's double standard makes the deception unmistakable. For its own corporate data, Fiserv deploys layered, possession-based multi-factor authentication ("**MFA**"), token generators, and biometric controls. For AEB's data, Fiserv withheld those protections. Instead, it relied on authentication methods so weak and susceptible to hacking that federal standards expressly prohibit their use.

4. AEB cannot fix these security failures on its own. Fiserv controls the systems that store and process AEB's data. As long as those systems remain inadequately secured, AEB faces ongoing hacking risks. Each day that passes without proper controls compounds that risk.

5. Fiserv has converted its own security failures into an upsell opportunity. If AEB moves to a technology provider that can safely protect its trade secrets, Fiserv would demand punitive, seven-figure "early termination" and deconversion fees as the price of release. Fiserv's ultimatum is clear: pay the ransom, or leave AEB's trade secrets exposed on systems Fiserv refuses to secure.

6. This is Fiserv's business model. According to *The Wall Street Journal*, Fiserv's misconduct is part of a pattern of victimizing small banks and the consumers they serve. After decades of acquiring other technology providers, Fiserv now dominates the market. Fiserv's strategy is to buy up its smaller competitors to stymie competition. Meanwhile, Fiserv has stopped making the investments needed to keep up with emerging technology and security risks—while locking banks into long-term contracts, intimidating customers into silence about security

problems, and holding customers' data hostage when they try to move to competitors. This gambit has fattened Fiserv's profits but exploited small banks and the customers they serve. *See* "Frustrated by the Tech Industry, Small Banks Start to Rebel," *The Wall Street Journal*, April 11, 2019, https://www.wsj.com/articles/small-banks-rebel-against-the-most-important-tech-firms-you-have-never-heard-of-11554975000, a true and correct copy of which is attached as Exhibit 1.

7. Accordingly, AEB brings this action under the Defend Trade Secrets Act and the Ohio Uniform Trade Secrets Act to recover damages for Fiserv's misappropriation of the bank's trade secrets, and to obtain injunctive relief compelling Fiserv to return the trade secrets it acquired and retained by deceiving AEB.

## Parties

8. Plaintiff The Antwerp Exchange Bank Company is an Ohio state-chartered bank with its principal place of business at 305 South Main Street, Antwerp, Ohio 45813.

9. Upon information and belief, Defendant Fiserv Solutions, LLC, formerly known as Fiserv Solutions, Inc., is a limited liability company organized under the laws of Wisconsin, with a principal place of business at 600 N. Vel R. Phillips Avenue, Milwaukee, WI 53203.

10. Upon information and belief, Defendant Fiserv, Inc. is a corporation incorporated under the laws of Wisconsin, with a principal place of business at 600 N. Vel R. Phillips Avenue, Milwaukee, WI 53203.

11. Fiserv, Inc. is Fiserv Solutions' parent corporation. Upon information and belief, Fiserv Solutions is a wholly owned subsidiary of Fiserv, Inc.

12. Upon information and belief, Defendants Fiserv, Inc. and Fiserv Solutions, LLC operate as an integrated enterprise, are agents of each other, and each defendant acted as the agent of the other defendant and within the scope of that agency. Among other things, Defendants maintain the same principal corporate headquarters, share common officers and employees,

conduct business through interconnected corporate entities with common business functions and purposes, and communicate with AEB through a common fiserv.com domain name. At all relevant times, Defendants acted through one another, and through their officers, employees, agents, and representatives, in carrying out the conduct alleged herein, and acted with the other Defendant's authority, knowledge, consent, and ratification of the conduct alleged herein.

## Jurisdiction & Venue

13. This Court has original subject-matter jurisdiction over AEB's Defend Trade Secrets Act claim under 28 U.S.C. § 1331 (federal question) because it arises under the laws of the United States. Further, this Court has supplemental jurisdiction over AEB's state-law claim for trade secret misappropriation because that claim is so related to the federal claim in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

14. This Court also has subject-matter jurisdiction over AEB's claims under 28 U.S.C. § 1332 (diversity) because there is complete diversity of citizenship among the parties. AEB is a citizen of a different state from either Defendant. The amount in controversy exceeds $75,000, exclusive of interest and costs.

15. Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the misconduct occurred in this district, and a substantial part of the property that is the subject of the action is situated in this district.

16. This Court has personal jurisdiction over Fiserv because Fiserv operates in this district or otherwise has contacts with this jurisdiction sufficient to subject it to personal jurisdiction here.

## FACTUAL BACKGROUND

17. AEB is a local community bank chartered by the State of Ohio. Founded in 1893, AEB serves the Antwerp community and the surrounding area in Ohio and Harlan, Indiana. AEB is federally insured by the FDIC and subject to the FDIC's regulations.

18. AEB offers a range of financial services, including but not limited to savings accounts, checking accounts, loans (such as auto loans, mortgages, and agriculture and commercial loans to support local farmers and businesses), and online banking.

19. Fiserv is among the largest technology vendors to banks. It claims approximately 10,000 financial institution clients and provides technology to more than one in three U.S. financial institutions.

20. Fiserv Solutions provides technology services to AEB under a Master Agreement. Attached hereto as **Exhibit 2** is a true and correct copy of the Master Agreement, as amended.

21. Among the services Fiserv provides are account processing services. An account processing system is the "brains" behind a bank, processing and recording all transactions for the financial institution.

22. Fiserv stores and processes AEB's most sensitive information—its own, non-public compilation of customer names, account numbers, balances, transaction histories, and other personally identifying information—across various Fiserv systems. That information, and AEB's compilation of it, constitutes AEB's trade secrets. Fiserv acquired it by misrepresenting the security controls on its systems, and then retained the trade secrets by continued deception.

## FISERV'S ASSURANCES:
## THE DUTY OF SECRECY FISERV UNDERTOOK AND THE SECURITY IT REPRESENTED

23. **Fiserv's Duty to Maintain Secrecy.** In the Master Agreement and the incorporated ASP Services Exhibit to the Master Agreement ("ASP Services Exhibit"),[1] Fiserv undertook a duty to maintain the secrecy of AEB's trade secrets and represented how it would do so:

a. Section 3(b) of the Master Agreement requires Fiserv to "use the same care and discretion to avoid disclosure of Information as it uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law." (Exhibit 2 at § 3(b).)

b. Section 4(a) of the Master Agreement requires Fiserv to implement and maintain an information security program that is designed to meet the following objectives:

   i. "protect the security and confidentiality of customer information";

   ii. "protect against any anticipated threats or hazards to the security or integrity of such information";

   iii. "protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer"; and

   iv. "ensure the proper disposal of 'consumer information'." (Exhibit 2 at § 4(a).)

c. Section 4(e) of the ASP Services Exhibit attached to the Master Agreement states that "Fiserv represents and warrants that: … (iv) functionality provided by the

---

[1] By its terms, the ASP Services Exhibit, which was executed concurrently with the Master Agreement (*see* Ex. 2 at 1), "shall apply" to any of the exhibits defining the actual services provided by Fiserv to AEB. Ex. 2 § 1. In other words, the terms of the ASP Services Exhibit were expressly incorporated into the relevant services agreements at issue in this action.

Fiserv System will enable Client to comply in all material respects with Federal regulations generally applicable to Fiserv's clients in the industry[.]" (Exhibit 2 at 9).

24. Fiserv consistently touted its commitment to robust security protocols in the materials that it provided to AEB and its other financial institution customers. Fiserv posts documentation about its security on a client file-sharing portal accessible to AEB and other Fiserv customers.[2] For example, Fiserv's *Cybersecurity Fact Sheet 2026*, S*tandard Information Gathering Questionnaire*, and *SOC 1 Type 2 Report* assert that Fiserv employs a robust cybersecurity program, including the implementation of **MFA** as part of its security strategy. These documents outline Fiserv's commitment to industry standards and regulatory requirements, including National Institute of Standards and Technology ("**NIST**") and International Organization for Standardization ("**ISO**") frameworks.

25. Fiserv's *Cybersecurity Fact Sheet 2026* (a true copy of which is annexed hereto as **Exhibit 3**) states that Fiserv "has established a Global Cybersecurity and Technology Management Policy based on authoritative sources that include regulatory and industry publications. . . . The policy and supporting standards have been designed to meet applicable industry and regulatory

[2] Fiserv disseminates its security disclosures through a file-sharing portal provided to Fiserv's customers that Fiserv alone controls and administers. AEB accessed documents on that portal at various times. Fiserv's own system logs can be used to establish the other times that AEB accessed these documents. The portal does not identify who at Fiserv authored, approved, or posted each document, or when Fiserv posted, modified, or removed a document. AEB therefore cannot plead, absent discovery, who at Fiserv made each false and misleading statement or precisely when. Those facts are peculiarly within Fiserv's exclusive knowledge. Because Fiserv can alter the portal's contents without notice or record, AEB alleges on information and belief that Fiserv posted additional false and misleading documents, which AEB reviewed and relied upon and Fiserv later deleted from the file-sharing portal. A reasonable opportunity for discovery will identify the authors, dates, and contents of these and any other removed documents.

requirements, including. . . National Institute of Standards and Technology (NIST) Cyber Security Framework, 800-53, 800-63-3." (Exhibit 3 at 1).

26. In Fiserv's Standard Information Gathering Questionnaire (a true copy of which is annexed hereto as **Exhibit 4**), Fiserv was asked "Is Multi-Factor Authentication (**MFA**) utilized?" Fiserv responded, "Yes." (Exhibit 4 at row H.3).

27. As described in the SOC 1 Type 2 Report: Fiserv Enterprise Technology (a true copy of which is annexed hereto as **Exhibit 5**), Fiserv requires its employees accessing Fiserv's systems to use "two-factor authentication that includes a token-generated one-time code." (Exhibit 5 at 121).

28. As detailed below, Fiserv did not implement compliant **MFA**, among other failures. Each of these assurances was therefore false when made and when repeated—and Fiserv acquired and retained AEB's trade secrets on the basis of these falsehoods.

## THE REGULATORY ENVIRONMENT

29. **MFA** is a security control that counters the most common hacking vector, a compromised password, by requiring two or more distinct factors: something the user knows (such as a password), possesses (such as a device or token), or is (such as biometric verification). **MFA** makes an account 99% less likely to be hacked.[3]

30. Not all **MFA** provides equal security. Some forms, such as codes sent by email or text, do not establish possession of a particular device. Those forms provide inadequate security because they are susceptible to hacking by interception, SIM-swap, or account takeover.

31. Federal standards and supervisory guidance reinforce these differences. Codes sent by text message are not secure. The United States Cybersecurity and Infrastructure Security

[3] https://www.cisa.gov/topics/cybersecurity-best-practices/multifactor-authentication

Agency describes text message codes as a "last resort MFA option" and appropriate only as a "temporary solution when organizations transition to a stronger MFA implementation." *See Implementing Phishing-Resistant MFA*, at 2-3 (a true copy of which is annexed hereto as **Exhibit 6**). Text messages are fairly simple to intercept or redirect, so a text-message code cannot satisfy the "what you have" factor: it does not establish possession of a particular device.

32. The Federal Financial Institutions Examination Council's ("FFIEC") *Authentication and Access to Financial Institution Services and Systems*[4] references and incorporates the *Digital Identity Guidelines* of NIST, which mandate: "Methods that do not prove possession of a specific device, such as … email, SHALL NOT be used for out-of-band authentication." *See* NIST SP 800-63B § 5.1.3.1. A true copy of *Digital Identity Guidelines* is annexed hereto as **Exhibit 7**. The *Digital Identity Guidelines* explain that "SHALL NOT" designates a "requirement[] to be followed strictly," and that "no deviation is permitted." *Id.* at "Requirements Notation and Conventions." The *Digital Identity Guidelines* further require that "[i]n the absence of a trusted statement that it is a multi-factor device, the verifier SHALL treat the authenticator as single-factor." *Id.* § 5.1.5.2.

33. A July 2025 update to NIST's *Digital Identity Guidelines* (a true copy of which is annexed hereto as **Exhibit 8**) reinforces that codes sent by email are insufficient to provide proper MFA: "Email SHALL NOT be used for out-of-band authentication because it may be vulnerable to:

- Access using only a password
- Interception in transit or at intermediate mail servers

---

[4] https://www.ffiec.gov/sites/default/files/media/press-releases/2021/authentication-and-access-to-financial-institution-services-and-systems.pdf

- Rerouting attacks, such as those caused by Domain Name System (DNS) spoofing."

34. Similarly, the Center for Internet Security ("CIS") states that phishing-resistant MFA methods (i.e., not email or SMS) are required for high-risk users and high-security environments.[5]

35. CISA, CIS, and NIST standards are routinely referenced by the FFIEC[6] and FDIC, and many of their standards are incorporated into FDIC guidance, examination procedures, and regulations. Section 501(b) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. §§ 6801-6809, tasks financial regulators (relevant here, the FDIC) with establishing administrative, technical, and physical safeguards for customer records.

36. Under the GLBA, the FDIC enacted Interagency Guidelines Establishing Information Security Standards, 12 C.F.R. Part 364, Appendix B, which mandates that federally insured depository institutions (such as AEB) implement measures to protect the security, confidentiality, and integrity of customers' personal information.

37. Specifically, depository institutions must implement "access controls on customer information systems, including controls to authenticate and permit access only to authorized individuals and controls to prevent employees from providing customer information to unauthorized individuals who may seek to obtain this information through fraudulent means." Further, depository institutions must "[e]xercise appropriate due diligence in selecting its service providers; [r]equire its service providers by contract to implement appropriate measures designed

---

[5] CIS Critical Security Controls, Version 8.1, Control 6 (Access Control Management), Safeguards 6.3–6.5, Center for Internet Security (2024), available at https://www.cisecurity.org/controls/v8.

[6] https://www.ffiec.gov/sites/default/files/media/press-releases/2021/authentication-and-access-to-financial-institution-services-and-systems.pdf.

to meet the objectives of these Guidelines; and [w]here indicated by the institution's risk assessment, monitor its service providers to confirm that they have satisfied their obligations." Fiserv's representation in the ASP Services Exhibit tracks this requirement: "functionality provided by the Fiserv System will enable Client to comply in all material respects with Federal regulations generally applicable to Fiserv's clients in the industry[.]" (Exhibit 2 at 9).

38. Part 364 explicitly recognizes that the security environment is constantly evolving and requires updating: "Each institution should monitor, evaluate, and adjust, as appropriate, the information security program in light of any relevant changes in technology, the sensitivity of its customer information, [and] internal or external threats to information." In addition, depository institutions must consider "the identified risks, commensurate with the sensitivity of the information as well as the complexity and scope of the institution's activities" in this changing environment.

39. The FDIC ensures that the banks it supervises are complying with federal regulations and best practices through references to external frameworks. The FDIC's Information Technology Risk Examination ("InTREx") Program, which the FDIC uses to examine compliance with 12 C.F.R. Part 364, Appendix B, among other federal regulations, embeds a cybersecurity preparedness assessment that "determines the bank's implementation of cybersecurity principles and standards" set forth in the NIST Cybersecurity Framework.[7] The FDIC's InTREx and cybersecurity preparedness assessment programs also incorporate the FFIEC IT Handbook's *Information Security* and *Outsourcing Technology Services* booklets, which reference NIST and

[7] FDIC, *Information Technology Risk Examination (InTREx) Program*, FIL-52-2023 (Sept. 29, 2023), https://www.fdic.gov/news/financial-institution-letters/2023/fil23052.html; FDIC Office of Inspector General, *Implementation of the FDIC's Information Technology Risk Examination (InTREx) Program*, No. AUD-23-001 (Jan. 31, 2023), at 10, https://www.fdicoig.gov/sites/default/files/reports/2023-02/AUD-23-001.pdf.

CIS standards. And as discussed above, the FFIEC references NIST, CISA, and CIS standards. These security guidelines are not merely aspirational; they are the framework that the FDIC uses to ensure bank compliance with Part 364, Appendix B.

40. Additionally, the FDIC, through the FFIEC, made available to the banks it supervises the Cybersecurity Assessment Tool ("CAT"), a voluntary tool that allowed institutions to identify their risks and determine their cybersecurity preparedness, and the FDIC incorporated that tool into the cybersecurity preparedness assessment it conducts under InTREx. The CAT expressly mapped its declarative statements to the NIST Cybersecurity Framework. And when the FFIEC sunset the CAT on August 31, 2025, it did not retire the underlying expectation; it directed supervised institutions to "refer directly to" new government resources instead, including NIST Cybersecurity Framework 2.0 and CISA's Cybersecurity Performance Goals.[8]

41. The FDIC uses the NIST SP 800-53 and NIST Risk Management Framework to protect its own data, and expressly references NIST, CISA, and other external standards as those that it is bound to follow. The FDIC has determined that the Federal Information Security Modernization Act is legally binding on it, and its information security program is evaluated each year against NIST SP 800-53, Revision 5, and the NIST Risk Management Framework.[9]

---

[8] FDIC, *FFIEC Cybersecurity Assessment Tool*, FIL-28-2015, https://www.fdic.gov/news/inactive-financial-institution-letters/2015/fil15028.html; FFIEC, *Cybersecurity Assessment Tool Sunset Statement* (Aug. 29, 2024), https://www.ffiec.gov/sites/default/files/media/press-releases/2024/cat-sunset-statement-ffiec-letterhead.pdf.

[9] FDIC Office of Inspector General, *The FDIC's Information Security Program – 2025* (Sept. 2025), https://fdicoig.gov/sites/default/files/reports/2025-09/Final%20Report_FISMA%202025%20-%20Public%20Version%20-%20Redacted%20AND%20Sanitized%20for%20Posting.pdf

## FISERV'S REALITY: ITS SYSTEMS LACK THE CONTROLS FISERV REPRESENTED, AND FISERV REFUSES TO FIX THEM

42. Despite its duty of secrecy and its representations that it followed industry standards such as NIST, CIS, and CISA, Fiserv did not implement those protections for AEB's trade secrets. Instead, Fiserv deployed materially weaker controls than those it uses for its own similar information—controls that fell below the industry and regulatory standard.

43. Fiserv does not properly implement or enforce **MFA** on multiple systems used to store AEB's information.

44. Fiserv sometimes relies on an email passcode challenge instead of **MFA.** Email does not establish possession of a specific device and does not qualify as a second factor under federal regulatory guidance. Nor does Fiserv use this weak method to secure its own confidential information. Fiserv's representation that it protects AEB's information with the same care it applies to its own was therefore false.

45. On other access paths, Fiserv uses codes sent over text message. Text message codes are insufficient to satisfy the possession factor of **MFA**. At best, as the above federal regulatory guidance explains, text message codes are a temporary bridge to stronger, phishing-resistant **MFA**. Fiserv deploys stronger possession-based **MFA** such as token- or app-based authenticators to protect Fiserv's own confidential information but fails to provide equivalent protections to AEB.

46. The absence of possession-based MFA thus falls short of both the protection Fiserv applies to its own data and the "reasonable standard of care" Fiserv represented it would apply under Section 3(b). Fiserv thereby breached the duty of secrecy it undertook—itself an improper means of acquiring and retaining AEB's trade secrets.

47. Fiserv's failure to provide compliant MFA also leaves AEB unable to comply with FDIC regulations. That renders false Fiserv's representation in Section 4(e) of the ASP Services Exhibit that: "(iv) functionality provided by the Fiserv System will enable Client to comply in all material respects with Federal regulations generally applicable to Fiserv's clients in the industry[.]" (Exhibit 2 at 9). Fiserv could not truthfully make that representation when its systems fail to meet the NIST standards the FDIC uses to assess a bank's regulatory compliance.

48. By misrepresenting its safeguards, Fiserv induced AEB to keep entrusting its trade secrets to Fiserv—and to keep paying for their custody. Meanwhile, Fiserv has materially increased the risk of further hacking and unauthorized access to AEB's extraordinarily sensitive confidential information.

49. AEB conducted a review of the security controls Fiserv provides to protect AEB's trade secrets, which uncovered deficiencies in virtually every area, as set forth below.

a. The Virtual Branch Online Bank Portal does not require **MFA**. Access to the Online Bank Portal requires only a username and password and, for certain information, a challenge question. Once in, a user can view and change sensitive information, including to (i) view customer, account-balance, and transaction information; (ii) create or update account and activity-based alerts; (iii) add or modify associated phone numbers and e-mail addresses; (iv) manage challenge questions; (v) initiate internal transfers; and (vi) initiate external payments to third parties.

b. The Client360 Portal, which is used by AEB employees to make administrative-level changes and initiate other service inquiries and requests to Fiserv, is accessed through a website and does not require MFA. Access requires only a

username, password, and, periodically, an email or text one-time password (OTP), depending on the user's selection. Through the Client360 Portal, a user can submit tickets asking Fiserv to change the online banking and other core processing systems. A ticket includes a description of the matter, its relative significance or severity, and any attachments. The information provided with a ticket, whether in comments or attachments, may include personally identifiable information about AEB customers or other AEB confidential information.

c. Premier, Fiserv's account processing system, supports real-time transaction processing and integrates with other Fiserv systems for deposits, loans, and customer services. It does not require **MFA**. Premier can be accessed with a username, password, and, periodically, an email OTP with an option to use OTP through an authenticator app. Access to Premier allows a user to view personally identifiable information about AEB customers, including account numbers, names, physical and email addresses, social security numbers, dates of birth, identification data, transaction histories, and other AEB confidential information.

d. Business Process Manager is a workflow system used for new account opening, is accessible through Premier, and does not require MFA. Access to Business Process Manager only requires access to Premier. Access to Business Process Manager allows a user to create and alter customer accounts and to view personally identifiable information about AEB customers, including account numbers, names, physical and email addresses, social security numbers, dates

of birth, identification data, transaction histories, and other AEB confidential information.

e. Fiserv Web Director is a system to view account statements, check images and related documents, is accessible through Premier, and does not require MFA. Access to Fiserv Web Director only requires access to Premier. Access to Fiserv Web Director allows a user to view AEB customer statements, check images, and related account documentation.

f. Integrated Teller is a teller platform used to process transactions, and does not require MFA. Access to Integrated Teller can be obtained either through Premier, without requiring further authentication, or through a desktop application, which requires only a username and password. Access to Integrated Teller allows a user to perform teller transactions on AEB customer accounts and to view customer account information.

g. Partnercare is Fiserv's support platform used by banks to research and manage consumer bill payment activity and related service issues, including reviewing customer account details and payment history. It is accessed via a web browser and does not require **MFA**. Access to Partnercare only requires a username, password, and, periodically, an email OTP. Access to Partnercare allows a user access to personally identifiable information, transaction history, and other confidential data.

h. Fiserv also provides an online banking platform for AEB's customers, offering account access and transaction capabilities. It is accessed via a web browser and does not require **MFA**. Access to the online banking platform only requires a

username and a password. An email OTP is required to access the "Profile" function within the platform. Access to this platform allows someone to view personally identifiable information, transaction history, communications between customers and AEB, and other confidential data.

i. Mobile Banking is Fiserv's mobile banking platform for bank customers. It provides account access and transaction capabilities. It is accessed via an application and does not require MFA. Access to Mobile Banking requires only a username and a password. Access to Mobile Banking allows a user to view personally identifiable information, transaction history, communications between customers and AEB, and other confidential data.

## FISERV'S PATTERN: KNOWN SECURITY GAPS, FALSE ASSURANCES, AND ACTIVE CONCEALMENT

50. Fiserv has long known that the authentication controls on its systems sold to financial institutions suffer from serious security defects. Yet Fiserv continued to sell, deliver, and operate those platforms while assuring financial-institution clients that their systems and data remained secure. That course of conduct—knowledge of the security gaps, false assurances that the controls existed, and concealment of their absence—is misappropriation: Fiserv acquired and retained AEB's trade secrets by misrepresentation, an improper means under the Defend Trade Secrets Act and the Ohio Uniform Trade Secrets Act.

51. Federal regulations call for financial institutions such as AEB to "[e]xercise appropriate due diligence in selecting its service providers," to "monitor [their] service providers to confirm they have satisfied their obligations" to protect trade secrets, and to "review audits, summaries of test results, or other equivalent evaluations of its service providers." 12 C.F.R. Part

364, App'x B at III.D. To enable that oversight—and to shape it—Fiserv distributes a "Compliance Package" and related security disclosures to AEB and other financial institution customers.

52. Fiserv gave these assurances by disseminating documents such as its *Enterprise Risk Management, Security and Privacy Program Overview* (the "*Security Overview*"). A true copy of the *Security Overview* updated in or about April 2018 is annexed hereto as **Exhibit 9**.

53. The *Security Overview* contains representations of present fact concerning Fiserv's then-existing "enterprise approach to information and physical security, risk management, incident response, business continuity management, and the privacy and protection of confidential data." Exhibit 9, at 3.

54. The *Security Overview* represents, among other things, that Fiserv has "enterprise standards and policies … designed to meet the objectives of applicable security and privacy laws, regulations, industry standards and contractual requirements. All Fiserv business units are required to comply with the Program." *Id*.

55. The *Security Overview* further represents that Fiserv aligned its cybersecurity program with the NIST Cybersecurity Framework, and that Fiserv performed ongoing analysis of its cybersecurity standards and practices to maintain alignment with the NIST Cybersecurity Framework, including associated updates applicable to critical-infrastructure service providers in the financial services sector:

> **NIST Cybersecurity Framework**
>
> The National Institute of Standards and Technology (NIST) issues and maintains the "Framework for Improving Critical Infrastructure Cybersecurity." This framework provides guidance regarding cybersecurity program elements and their associated effectiveness. Fiserv is a service provider to the Financial Services Sector, which is considered by the Department of Homeland Security to be a critical infrastructure sector. **Fiserv performs ongoing rigorous analysis of its existing cybersecurity standards and practices to maintain alignment with the NIST framework, including all associated updates**.

*Id.* at 7 (emphasis added).

56. Fiserv continued to state that the "Fiserv cybersecurity program and framework are built on the NIST framework" in the 2019 updated *Security Overview*, at 7. The 2019 *Security Overview* went on to highlight Fiserv's obligation to maintain currency with evolving legal and regulatory standards and the role of its Legal Department in coordinating that task:

> Our products and services must meet ever-evolving legal, regulatory and other third-party standards for security, functionality, interoperability and performance. As a result, Fiserv must be aware of and responsive to changes in the external environment to serve our clients properly . . . and to meet regulatory standards. The Fiserv Legal Department continually monitors the legal landscape with respect to the delivery of Fiserv services to its clients, as well as regulatory impact on Fiserv policies, standards and practices. . . . Fiserv monitors and adapts systems and processes in response to a continuously evolving regulatory environment.
>
> *Id*. at 8. A true copy of the 2019 *Security Overview* is annexed hereto as **Exhibit 10**.

57. Each of these representations is consistent with the regulatory framework by which AEB is required to protect its customers' information. Each also tracks Fiserv's representation that its services would enable AEB to comply with those requirements. AEB relied on these representations in assessing its own compliance with industry and regulatory standards, and in deciding whether to continue its relationship with Fiserv and to keep entrusting Fiserv with AEB's trade secrets.

58. Fiserv received repeated warnings that its controls failed to protect financial institutions. Instead of fixing root causes, Fiserv relied on outdated practices and patchwork responses. Those choices exposed AEB's customer information to compromise by hackers and forced AEB—and other institutions—to operate under hidden, avoidable risk.

59. In August 2018, *Krebs on Security* reported a Fiserv defect that allowed unauthorized access to consumers' account and transaction records and allowed changes to phone numbers and email addresses used for transaction alerts.[10]

60. Customers attempted to alert Fiserv directly, including through messages to the social-media accounts of Fiserv's CEO and other individuals identified as affiliated with Fiserv. Yet Fiserv did not treat the defect as urgent. It acted only after media scrutiny made inaction reputationally costly.

61. Fiserv spokesperson Ann Cave admitted publicly that Fiserv delayed addressing these known problems until media exposure forced its hand, confirming its reckless disregard for customer security. Ms. Cave confirmed that Fiserv did not make efforts to remediate this known threat until *after* receiving an inquiry from a *reporter*—when negative press coverage was imminent. According to Ms. Cave, "[a]fter receiving [the reporter's] email, [Fiserv] promptly engaged appropriate resources and worked around the clock to research and remediate the situation. [Fiserv] developed a security patch within 24 hours of receiving notification and deployed the patch to clients that utilize a hosted version of the solution. [Fiserv] will be deploying the patch this evening to clients that utilize an in-house version of the solution." Thus, only after Fiserv faced the imminent prospect of negative press attention did Fiserv "promptly engage[] appropriate resources" to fix its security lapse. This delay, however, left hundreds of financial institutions vulnerable long after Fiserv knew of the risk.

62. Fiserv's indifference to cybersecurity persists to this day.

---

[10] "Fiserv Flaw Exposed Customer Data at Hundreds of Banks," https://krebsonsecurity.com/2018/08/fiserv-flaw-exposed-customer-data-at-hundreds-of-banks/.

63. In early May 2026, reports surfaced that a ransomware group known as Everest claimed to have breached Fiserv's systems. Fiserv did not respond to the reporting of this data breach either publicly or, upon information and belief, to its federally regulated clients, such as AEB.

64. Consistent with its obligations under federal regulations to monitor the performance of its service providers, AEB requested that Fiserv provide information concerning the alleged data breach and whether AEB's confidential information was accessed, in the Everest breach or otherwise.

65. Fiserv's counsel responded to AEB's inquiry, with responses based on multiple layers of hearsay, identifying a third-party Fiserv vendor as the party Everest repeatedly breached over a five-month period (during which neither Fiserv nor the third-party vendor reported the breach of a system holding federally protected confidential information). Fiserv's counsel further denied, without any objective proof, that AEB's confidential information had been compromised in any way. Fiserv refused to provide any further information in response to AEB's follow-up inquiries.

66. While AEB was seeking answers to its questions concerning the Everest data breach referred to above, news outlets began publicly reporting the existence of a second data breach involving Fiserv by the group known as "Cl0p." Those sources (which included Reuters) reported that Cl0p had exploited vulnerabilities in Fiserv's PTC Windchill and FlexPLM software, had stolen Fiserv's data, and had been making ransom demands since mid-July 2026, before AEB had made its inquiry about the Everest breach and before Fiserv's counsel's response.

67. When AEB requested information concerning Cl0p's intrusion and its effect on AEB's confidential information, it received a similar conclusory denial from Fiserv's counsel: The

systems at Fiserv that were breached had nothing to do with the services provided to AEB, and AEB's confidential information was not affected.

68. As Fiserv's systems endure repeated attacks, questions have arisen concerning Fiserv's business strategy going forward, including whether it will continue providing services to financial institutions such as AEB under agreements such as the Master Agreement. Fiserv continues to hold AEB's trade secrets on those systems, yet it has refused to tell AEB whether it will continue providing services under the Master Agreement or whether any contemplated transaction will impair performance of those services.

69. Unfortunately, Fiserv's corporate culture discouraged emphasis on data security. Even one of Fiserv's own employees recognized the inadequacy of Fiserv's support and outreach channels. In a post responding to another *Krebs on Security* article about additional security problems with Fiserv's online banking platform, Adam Kinder, Fiserv's Information Security Manager, publicly invited customers to message him through his personal social media account[11] so that he "can use what influence [and] means I have at our company, above and beyond customer support and outreach branches, to address their concerns." That public admission tracks what

[11] Fiserv's Code of Conduct & Business Ethics, which was in effect at or around the time of Kinder's comment, contains a social media policy that covers the use of LinkedIn, Twitter, Facebook, forums, and blogs, and Fiserv regulates its employees' use of Fiserv's trademarks on social media. Fiserv notes that social media "is an established part of many people's personal and professional lives-and the lines have blurred." *See* https://web.archive.org/web/20230601125645/https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c. The current version of Fiserv's Code of Conduct & Business Ethics, which contains the same social media policy is available at https://d1io3yog0oux5.cloudfront.net/_583f477852403c9df0b7b630e3701167/fiserv/db/2275/21421/file/Code+of+Conduct+%26+Business+Ethics.pdf. Accordingly, Fiserv knows, or should have known, about communications sent to the social media accounts of its agents who have identified themselves as Fiserv representatives on social media platforms.

Fiserv's customers experienced: Fiserv's formal channels did not reliably surface or remediate high-risk security defects.

70. In another example, an executive of one of Fiserv's credit union clients found that a hacker had compromised her own account at the credit union, changed the email address and phone number associated with it, and thereby obtained, among other things, her home address and transaction history.

71. The credit union identified the problem in Fiserv's online banking system application as the lack of **MFA** consistent with accepted security practices and reported the problem to Fiserv.

72. But Fiserv failed to require **MFA**, leaving its system vulnerable to further attacks.

73. Fiserv went so far as to protest to the credit union's counsel that the credit union's complaints relating to Fiserv's failure to implement **MFA** "imposed significant cost and inconvenience on Fiserv."

74. For Fiserv, serious efforts at compliance often begin at the proverbial courthouse steps. When regulated financial institutions demand that Fiserv honor its security and oversight obligations, Fiserv resists until litigation forces the issue and compels action. Public filings reflect that pattern.

75. In 2022, the U.S. Courthouse SDNY Federal Credit Union, the credit union serving judges and employees of the U.S. District Court for the Southern District of New York (the "Court Credit Union"), discovered security problems with Fiserv's online banking application. In particular, the Court Credit Union found that Fiserv's authentication controls were weak and could easily be bypassed, allowing Court Credit Union online banking accounts to be hacked.

76. This hacking raised significant additional concerns for the Court Credit Union and its members—federal judges, U.S. Marshals, and court employees. A hacker of the Court Credit Union would be able to access nonpublic personal information and transaction history, such as a member's home address and usage patterns for a debit card. Such information could facilitate stalking, harassment, or other criminal conduct directed at those members.

77. The Court Credit Union decided to terminate its relationship with Fiserv largely on account of these security failures. Fiserv demanded an early termination fee before it would permit the Court Credit Union to terminate the relationship.

78. The Court Credit Union sued Fiserv over the online-banking security failures Fiserv refused to address, and to challenge the early-termination fee Fiserv asserted when the Court Credit Union—then merging with another credit union—decided to leave Fiserv for a more secure system. *U.S. Courthouse SDNY Federal Credit Union et al. v. Fiserv Solutions, LLC et al.*, No. 1:22-cv-09329 (S.D.N.Y. 2022).

79. Fiserv resolved the case shortly after it was filed. But by prioritizing early-termination fees and leverage over the Court Credit Union instead of fixing security problems, Fiserv prolonged the exposure of the Court Credit Union's members—judicial personnel and U.S. Marshals—to the risk of hacking.

80. Other litigation by financial institutions raising trade secret misappropriation claims against Fiserv include *Bessemer System Federal Credit Union v. Fiserv Solutions, LLC*, No. 2:19-cv-00624-RJC (W.D. Pa. 2019); *Cencap Federal Credit Union v. Fiserv Solutions, LLC*, Case No. 3:25-cv-00913-VDO (D. Conn. 2025); *Self-Help Credit Union v. Fiserv Solutions, LLC*, Case No. 1:25-cv-01112-TDS-LPA (M.D.N.C. 2025); *FiCare Federal Credit Union v. Fiserv Solutions, LLC*, Case No. 8:26-cv-00231-JLB-GDP (M.D. Fla. 2026); *POLAM Federal Credit Union v.*

*Fiserv Solutions, LLC*, Case No. 2:26-cv-02352-SK (C.D. Cal. 2026); *Educational & Governmental Employees Federal Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 7:26-cv-02402-NSR (S.D.N.Y. 2026); *Midwest Family Federal Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 2:26-cv-00234 (N.D. Ind. 2026); and *Marshall Community Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 1:26-cv-02858 (W.D. Mich. 2026).

81. In 2019, the Bessemer System Federal Credit Union sued Fiserv in the Western District of Pennsylvania for failing to safeguard its information properly. Given Fiserv's security problems and apparent inability to fix them, Fiserv agreed to return the credit union's records. After Fiserv failed to dispossess itself of the records, the credit union filed a motion for injunctive relief compelling Fiserv to return the records.

82. In response, Fiserv unequivocally represented to the Bessemer Court it had fully returned the credit union's records, which was central to the court's denial of injunctive relief. Fiserv falsely represented to the Court that it had provided the credit union with "a complete set of" the requested records. *See* Letter dated June 26, 2019, at 2 (a true copy of which is annexed hereto as **Exhibit 11**). Specifically, Fiserv's opposition to a preliminary injunction filed with the court claimed that "[d]efendants indisputably sent the records" and "[a]ny claim that [d]efendants are 'denying access' to this data is simply false." *Id*.

83. The *Bessemer* court denied an injunction based on Fiserv's assurances that the credit union's records had been returned. *See Bessemer System Federal Credit Union v. Fiserv Solutions, LLC et al.*, No. 2:19-cv-00624-RJC (W.D. Pa. 2019), Dkt. 26.

84. Later, Fiserv provided the credit union with hundreds of records that Fiserv had previously assured the Bessemer court it had already returned—confirming that Fiserv misled the credit union's counsel and the court.

85. Instead of candidly disclosing known defects to its clients and coordinating remediation, Fiserv actively concealed defects from its clients. When another financial institution reported security problems that allowed online banking accounts to be readily taken over by hackers, Fiserv responded with threats and litigation pressure designed to silence disclosure. Indeed, Fiserv demanded that the credit union "[r]efrain from dissemination or disclosure of any information or records relating to the 'security review' to third parties, including any clients . . . of Fiserv." Those threats did not protect Fiserv's customers; they protected Fiserv's reputation and revenue.

## FISERV ACQUIRED AND RETAINED AEB'S TRADE SECRETS BY DECEIVING AEB ABOUT THE NATURE AND EXISTENCE OF FISERV'S SECURITY CONTROLS

### 1. Fiserv Provides a Fraudulent "Compliance Package" to Financial Institutions Misrepresenting the Security Controls Fiserv Has on Its Systems

86. As a regulated financial institution, AEB must conduct oversight of third-party vendors such as Fiserv. To facilitate and influence that oversight, Fiserv authored, assembled, and provided to AEB a "Compliance Package" representing that Fiserv had implemented security measures sufficient to meet financial-institution regulatory requirements, on which AEB relied in conducting its required oversight of Fiserv as a third-party vendor.

87. Fiserv updated the Compliance Package from time to time throughout the parties' relationship and, through each updated version, affirmatively represented to AEB that Fiserv continued to comply with evolving regulatory and industry requirements. AEB relied on those recurring representations in continuing to use Fiserv's services and to entrust its trade secrets to Fiserv rather than another vendor. Those representations were false and misleading.

88. Among the materials in Fiserv's Compliance Package is the *Standard Information Gathering Questionnaire* (the "SIG Questionnaire"). AEB used the SIG Questionnaire to assess

Fiserv's security posture and suitability to protect AEB's trade secrets, as Fiserv knew and intended.

89. The questionnaire asks: "Are information security policies, standards, and procedures based on accepted control standards, frameworks, and industry practices?" Fiserv answered "Yes," and further represented that Fiserv's cybersecurity policies and standards track NIST and other recognized standards. Specifically, Fiserv represented, among other things:

> Fiserv's cybersecurity and technology policy, standards, guides and procedures are based on established controls, frameworks, and industry practices, such as ISO 27001, NIST Cybersecurity Framework, and COBIT. These documents outline specific control objectives and requirements that align with industry standards and regulatory requirements, ensuring a robust security posture and effective risk management in addressing current and emerging threats.

90. Those statements were false and misleading. As described above, Fiserv did not comply with accepted control standards, frameworks, and industry practices, including NIST authentication requirements.

91. Indeed, on January 20, 2026, Fiserv, through counsel, asserted in open court in data-security litigation brought by one of its other financial institution clients that NIST is not mandatory or binding on Fiserv, and that there is nothing in Fiserv's Master Agreement that requires Fiserv to adopt NIST standards. Fiserv's recent admissions revealed that Fiserv's prior representations concerning its alignment with the NIST standards did not reflect Fiserv's actual cybersecurity practices. Moreover, given Fiserv's position that its Master Agreement imposes no contractual obligation for Fiserv to incorporate or maintain alignment with the NIST standards, Fiserv's representations about its NIST compliance were non-contractual statements of fact. Misrepresentation is an improper means of acquiring a trade secret, and Fiserv's own position confirms that AEB's claims sound in misappropriation, not contract.

92. The questionnaire also asks: "Is Multi-Factor Authentication (MFA) utilized?" Fiserv answered: "Yes."

93. That statement was false and misleading. As described above, Fiserv did not use **MFA** on many of its systems, and the authentication process it did use does not meet recognized standards for **MFA**.

94. Fiserv also provided AEB with a *Fiserv Cybersecurity Fact Sheet 2026*, which again represented that "Fiserv has established a Global Cybersecurity and Technology Management Policy based on authoritative sources that include regulatory and industry publications such as NIST's CSF (National Institute of Standards and Technology, Cyber Security Framework) which is a subset of controls within the comprehensive NIST SP 800-53 standard."

95. The *Fiserv Cybersecurity Fact Sheet 2026* further represented that Fiserv's policy and standards "have been designed to meet applicable industry and regulatory requirements," including NIST's "Cyber Security Framework, 800-53, 800-63-3." AEB received the *Cybersecurity Fact Sheet 2026* as part of the recurring Compliance Package described above and relied on it, together with Fiserv's other recurring representations, in continuing to use Fiserv's services rather than seeking a different vendor.

96. Those statements were false and misleading. As set forth above, Fiserv's use of an "email passcode challenge" as a purported second factor for **MFA** violates NIST Special Publication 800-63-3, which expressly prohibits email from being used for **MFA**.

**2. Fiserv's SOC Report**

97. Fiserv's compliance representations to AEB rest heavily on its SOC 1 Type 2 Report (the "SOC Report"), which Fiserv furnishes to financial institution customers as independent assurance that its security controls are adequate. Federal regulations require depository institutions

to obtain and review such audits in conducting vendor oversight. *See* 12 C.F.R. Part 364, App'x B § II.D.3. AEB relied on the SOC Report in evaluating Fiserv's security posture and in fulfilling its own regulatory obligations.

98. Fiserv's current Chief Risk Officer ("CRO"), Joanne Sebby, served as a liaison to the Federal Financial Institutions Examination Council, which establishes the cybersecurity standards at issue in this litigation. A true and correct copy of the biography of Joanne Sebby on Fiserv's website, located at https://www.fiserv.com/en/about-fiserv/executive-leadership/joanne-sebby.html, is annexed hereto as **Exhibit 12**; *see* ¶ 32, *supra*. Upon information and belief, Ms. Sebby has personal, first-hand knowledge of the cybersecurity standards promulgated by FFIEC, yet failed to implement them at Fiserv or conduct other appropriate risk assessments to ensure Fiserv was protecting the highly sensitive information its customers entrusted.

99. As described in the SOC Report, the CRO is a member of Fiserv's Management Committee with "leadership responsibilities for the Enterprise Risk & Controls function." Under Fiserv's "Three Lines of Defense" governance model, the CRO occupies the Second Line of Defense: the executive directly responsible for the design, maintenance, and oversight of risk management practices, including the enterprise-level security controls applicable to all Fiserv products.

100. The failure of Fiserv's Chief Risk Officer to ensure Fiserv was compliant with FFIEC cybersecurity standards is consistent with Fiserv's broader pattern of disregard of known risks and concealment. Rather than making its systems compliant with the cybersecurity standards Fiserv's own Chief Risk Officer would be expected to know were appropriate to address hacking risks, Fiserv decided not to implement those standards.

### 3. Fiserv Publishes a False and Misleading Privacy Notice

101. Fiserv, Inc. publishes and maintains a publicly available "Privacy Notice" that states, as present fact, the security measures Fiserv claims it has in place to protect customer data. The Privacy Notice purports to apply to Fiserv, Inc. and all subsidiaries and affiliates, including Fiserv Solutions. [12] The Privacy Notice is maintained on an ongoing basis, and AEB relied on the Privacy Notice's representations, together with Fiserv's other recurring assurances, in continuing its relationship with Fiserv rather than seeking a different vendor.

102. In Section 6, Fiserv represents that it has "in place appropriate security measures to prevent . . . personal data from being accidentally lost, used or accessed in an unauthorized way, altered or disclosed."

103. That statement was false and misleading when made. Contrary to Fiserv's representation, Fiserv did not have appropriate security measures in place to prevent AEB's data from being used or accessed in an unauthorized way.

104. Fiserv's misrepresentations and concealment harmed AEB in a straightforward way: they deprived AEB of the facts it needed to decide whether to keep entrusting its trade secrets to Fiserv. Had AEB known the truth, it would not have furnished its trade secrets to Fiserv or allowed them to remain on Fiserv's insecure systems. Fiserv withheld the truth while continuing to accept payment for services it represented as secure and compliant with legal requirements.

105. Fiserv had strong financial motives to sustain the appearance of robust cybersecurity to maintain market and customer confidence in its systems. Fiserv's public filings reflect that goodwill and intangible assets make up a significant portion of Fiserv's corporate assets and that, as a publicly traded company, Fiserv's valuation depends on market and customer confidence in its systems. By suppressing adverse security information and downplaying risk,

[12] A copy appears at https://www.fiserv.com/en/about-fiserv/privacy-notice.html.

Fiserv misleadingly obtained customer revenue, reduced its customers' switching pressure, and fattened corporate goodwill—at its customers' expense.

106. Fiserv's incentives to deceive intensified recently as Fiserv's share price fell sharply. Fiserv's stock is down approximately 70% over the past year, heightening Fiserv's pressure to avoid disclosures that could further impair market confidence and customer retention.

107. Fiserv's misconduct was far from accidental. Fiserv knew about material security defects, minimized or misrepresented them, delayed remediation until external exposure threatened, and pressed to suppress the truth from its customers.

108. That course of conduct was willful and malicious. It reflects deliberate disregard for the security of AEB's trade secrets and its customers' information, and it supports an award of exemplary damages and attorneys' fees under the Defend Trade Secrets Act and the Ohio Uniform Trade Secrets Act.

109. As a direct result, AEB has incurred and will continue to incur substantial costs to protect customers, monitor fraud, investigate suspicious activity, reimburse customers' fraud losses, and mitigate long-tail identity-theft risks created by Fiserv's security failures.

## THE NEGATIVE IMPACT ON AEB AND ITS CUSTOMERS

110. The information entrusted to Fiserv includes highly sensitive personal and financial data. If compromised, identity thieves can weaponize that data to drain accounts, change contact credentials, defeat fraud alerts, and impersonate customers across other systems. This is why federally insured depository institutions are required to oversee their vendors to ensure that the institution is meeting federal requirements and safeguarding its customers' information.

111. The harm does not end with a single incident. Once exposed, customer information can circulate indefinitely, including through illicit marketplaces. Customers face continuing risk

of identity theft, account takeover, and downstream fraud—often months or years after the original exposure.

112. Cybercriminals also exploit stolen data to inflict non-monetary harms, including harassment, extortion attempts, and targeted stalking. Transaction times and locations can reveal personal routines and physical whereabouts.

113. Most importantly, customers face irreparable harm when hackers gain access to their most sensitive financial information. Transactional data can reveal intimate facts of customers' lives, including, for example, which customers paid retainers to a divorce attorney or which customers received care from a psychiatrist, drug-rehabilitation clinic, cancer center, fertility clinic, or abortion clinic. *See* "The Hidden Emotional Toll on Victims of Data Breaches," *The Wall Street Journal*, Nov. 25, 2025, https://www.wsj.com/tech/cybersecurity/data-breach-victims-0b01a5ab?mod=Searchresults&pos=2&page=1. **Exhibit 13** is a true and correct copy of *The Wall Street Journal* article.

114. Criminals can also use AEB's customer information to fuel embarrassment, blackmail, or harassment in person or online, or to commit other types of fraud, including obtaining ID cards or driver's licenses, fraudulently obtaining tax returns and refunds, and obtaining government benefits. For example, the times and places at which customers use their debit cards can be used to stalk and victimize them. A report from the United States Government Task Force on Identity Theft explains the harm to businesses such as AEB:

> Businesses suffer most of the direct losses from . . . identity theft because individual victims generally are not held responsible for fraudulent charges. Individual victims, however, also collectively spend billions of dollars recovering from the effects of the crime.
>
> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, monetary costs of identity theft include indirect costs to businesses for fraud prevention and mitigation of the harm once it has occurred (e.g., for mailing notices to consumers and upgrading systems). Similarly, individual victims often

> suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit . . . .
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.[13]

115. The FBI Internet Crime Complaint Center's 2024 Internet Crime Report reveals that, between 2020 and 2024, it received 4.2 million complaints related to various internet scams affecting American citizens around the globe, amounting to a staggering $50.5 billion in reported losses, and an average of 836,000 complaints received per year. In 2024 alone, the crime categories of personal data breach, general data breach, credit card/check fraud, and identity theft accounted for $2.19 billion in losses. The average reported loss per complaint in 2024 was $19,372.[14]

116. Stolen data can also be offered for sale on the "dark web," an unindexed part of the internet (often heavily encrypted)[15] that makes it difficult for authorities to detect a website's location or owners. The dark web is notorious for hosting marketplaces selling items such as weapons, drugs, and personal information.

117. Once a bad actor buys customer information, it can then be used to gain access to different areas of the victim's digital life, including financial accounts, social media, and credit

---

[13] The President's Identity Theft Task Force, Combating Identity Theft: A Strategic Plan, Federal Trade Commission, 11 (April 2007).

[14] See https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

[15] Unindexed means that the dark web is not accessible by normal search engines (e.g., Google) and requires use of a TOR or similar browser, which conceals users' identities and online activity.

card details. During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

118. In addition to customer information that can be accessed, a hacked online banking account can be very valuable to cybercriminals for other attacks. Since online banking accounts are linked to other accounts (for example, to transfer funds between financial institutions), a hacked online banking account can serve as a gateway for additional criminal activity.

119. The harm is not always immediately apparent. The stolen data may be listed for sale on the dark web years after the initial breach, enabling unauthorized individuals to purchase and exploit it after the security incident has faded from immediate concern.

120. Compounding this risk is the practice known as "dwell" by hackers, where unauthorized access remains undetected for extended periods. During this time, cybercriminals can continue to exploit access across multiple systems within the same network, gather additional sensitive information, and fortify their control over compromised data without triggering immediate detection. This latency often results in the hack going unnoticed until long after the initial breach, amplifying the potential for further exploitation.

121. Because of these delayed risks, the full scope of the breach may not be immediately apparent. Indeed, to protect its customer information, AEB will need to remain vigilant against compromise and unauthorized use of its customer information for years, if not decades, to come.

## AEB'S CLAIMS ARE TIMELY

122. AEB exercised reasonable diligence but could not discover Fiserv's misconduct earlier because of Fiserv's deliberate and active concealment.[16]

[16] "As the discovery rule has developed, the salient point giving rise to its application is the inability of the injured, despite the exercise of reasonable diligence, to know what he is injured and by what cause." *Bessemer Sys. Fed. Credit Union v. Fiserv Sols., LLC*, 472 F. Supp. 3d 142, 168 (W.D. Pa. 2020) (quoting *Fine v. Checcio*, 582 Pa. 253, 870 A.2d 850, 858 (Pa.

123. AEB became aware of the harm caused by Fiserv's security deficiencies only recently, well within the applicable limitations period.

124. AEB previously did not suspect, and had no reason to suspect, that Fiserv's products and services caused damages and harm.

125. The highly technical nature of Fiserv's products and services prevented earlier detection of these serious cybersecurity problems.

126. Fiserv maintained exclusive knowledge of the material defects and vulnerabilities designed and implemented into its products and services, actively misleading AEB.

127. In addition, Fiserv's fraudulent concealment and other tortious conduct have tolled the running of any statute of limitations.

128. Fiserv was aware of the material defects in its systems and knew that it lacked the security controls it had represented and that regulators require. Fiserv also knowingly, affirmatively, and actively concealed from AEB the risks associated with the defects of its products and services, and that these defects caused damages and harm to AEB.

129. Fiserv's purpose in concealing these facts was to induce AEB to continue relying on its services and to delay AEB's discovery of its claims. By concealing material information, Fiserv sought to avoid early detection of its misconduct and to prevent AEB from initiating legal action within the applicable limitations period.

130. Fiserv committed tortious and fraudulent acts that continue to this day. As of the date of this Complaint, Fiserv still has not disclosed, and continues to conceal, that it designed and implemented insecure features into its products and services, and that the representations it made

2005)) (denying Fiserv's motion to dismiss the plaintiff credit union's claim as time-barred, relying on the discovery rule).

about the security of its services are false. Despite its knowledge of the defects and their attendant risks, Fiserv continues to market its products and services to financial institutions while failing to disclose known and foreseeable harms.

131. AEB did not know, and could not through reasonable diligence have learned, that it had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Fiserv's acts and omissions.

132. For the foregoing reasons, Fiserv is estopped from relying on any statutes of limitation or repose or other time-based defenses in this action. All applicable statutes of limitation and repose have been tolled by the discovery rule and by Fiserv's active concealment with respect to all claims against it.

## Causes of Action

### First Claim for Relief
### Defend Trade Secrets Act
### (18 U.S.C. § 1836, *et seq.*)

133. AEB incorporates the preceding allegations.

134. AEB is the owner of all right, title, and interest in and to certain valuable trade secrets relating to its business operations. AEB's trade secrets include, but are not limited to, the identities and contact information of its customers and employees, the compilation of customers' financial history and transactions as reflected on account records and information, and credit information.

135. AEB's trade secrets are related to products and services used in and intended to be used in interstate and foreign commerce.

136. Other than through Fiserv's unlawful acquisition, the trade secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

137. AEB has taken reasonable measures to maintain the secrecy of its trade secrets, including insisting that Fiserv protect their secrecy pursuant to the Master Agreement, Fiserv's Privacy Notice, and other Fiserv commitments regarding data security. AEB has also implemented an Information Security Program which includes a confidentiality policy, data loss prevention policy, an email security policy, which together protect the secrecy of AEB's trade secrets by imposing limits on access, use and dissemination of those trade secrets.

138. AEB has invested substantial resources in developing, compiling, and protecting its trade secrets. These trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, AEB's competitors or others who could obtain economic value from their disclosure or use. For example, AEB's compilation of confidential customer financial information and detailed transactional history (which includes past loan payment history, savings account history, checking account overdraft history, and the regularity and amounts of deposits into savings accounts) allows AEB to assess loan risk more accurately than competitors lacking that information and, in turn, to offer its customers loans and savings products at highly competitive rates. AEB's trade secrets thus provide it with a concrete competitive and economic advantage that would be lost if they were disclosed to or used by a competitor.

139. Fiserv knew or should have known that AEB's information at issue comprised AEB's trade secrets.

140. Fiserv misappropriated, and continues to misappropriate, AEB's trade secrets by acquiring them through improper means—namely, by misrepresenting to AEB the existence and nature of Fiserv's security controls. Had Fiserv told AEB the truth, AEB would not have furnished its trade secrets to Fiserv or allowed them to remain stored and accessible on Fiserv's insecure

systems. Fiserv's unlawful acquisition of AEB's trade secrets is an act of misappropriation under 18 U.S.C. § 1839(5)(A).

141. Fiserv also misappropriated AEB's trade secrets by using them for its own commercial advantage without AEB's express or implied consent, as Fiserv procured any such consent by misrepresentation. By concealing Fiserv's security failures, Fiserv retained AEB's business and the fees that came with it, and avoided the cost of the controls it had represented were in place. Further, Fiserv is seeking to levy termination-related fees and "deconversion" fees before Fiserv will dispossess itself of AEB's trade secrets so that AEB can remove its trade secrets from Fiserv's custody to ensure they are properly secured. Fiserv's unlawful use of AEB's trade secrets is an act of misappropriation under 18 U.S.C. § 1839(5)(B).

142. Upon information and belief, Fiserv also misappropriated AEB's trade secrets by using or disclosing them without AEB's consent—consent Fiserv procured by misrepresentation—including by exposing them on insecure systems and, through the security failures described above, disclosing them to hackers. Fiserv's unlawful use or disclosure of AEB's trade secrets is an act of misappropriation under 18 U.S.C. § 1839(5)(B).

143. At the time of Fiserv's use and disclosure of AEB's trade secrets, Fiserv knew or had reason to know that it acquired the trade secrets by improper means, under circumstances giving rise to a duty to maintain their secrecy or limit their use, from or through a person who had a duty to AEB to maintain the trade secrets' secrecy and limit their use, or by AEB's mistake prior to a material change of Fiserv's position.

144. Fiserv's acts constitute violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

145. Fiserv's misappropriation was willful and malicious, entitling AEB to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

146. As a direct and proximate result of Fiserv's misappropriation of AEB's trade secrets, AEB has suffered and will continue to suffer irreparable harm and damages, including its actual losses and Fiserv's unjust enrichment.

**Second Claim for Relief**
**Ohio Uniform Trade Secrets Act**
**(Ohio Rev. Code § 1333.61, *et seq.*)**

147. AEB incorporates the preceding allegations.

148. AEB is the owner of all right, title, and interest in and to certain valuable trade secrets relating to its business operations. AEB's trade secrets include, but are not limited to, the identities and contact information of its customers and employees, the compilation of customers' financial history and transactions as reflected on account records and information, and credit information.

149. Other than through Fiserv's unlawful acquisition, the trade secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

150. AEB has taken reasonable measures to maintain the secrecy of its trade secrets, including insisting that Fiserv protect their secrecy pursuant to the Master Agreement, Fiserv's Privacy Notice, and other Fiserv commitments regarding data security. AEB has also implemented an Information Security Program which includes a confidentiality policy, data loss prevention policy, an email security policy, which together protect the secrecy of AEB's trade secrets by imposing limits on access, use and dissemination of those trade secrets.

151. AEB has invested substantial resources in developing, compiling, and protecting its trade secrets. These trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, AEB's competitors or others who could obtain economic value from their disclosure or use. For example, AEB's compilation of confidential customer financial information and detailed transactional history (which includes past loan payment history, savings account history, checking account overdraft history, and the regularity and amounts of deposits into savings accounts) allows AEB to assess loan risk more accurately than competitors lacking that information and, in turn, to offer its customers loans and savings products at highly competitive rates. AEB's trade secrets thus provide it with a concrete competitive and economic advantage that would be lost if they were disclosed to or used by a competitor.

152. Fiserv knew or should have known that AEB's information at issue comprised AEB's trade secrets.

153. Fiserv misappropriated, and continues to misappropriate, AEB's trade secrets by acquiring them through improper means—namely, by misrepresenting to AEB the existence and nature of Fiserv's security controls. Had Fiserv told AEB the truth, AEB would not have furnished its trade secrets to Fiserv or allowed them to remain stored and accessible on Fiserv's insecure systems.

154. Fiserv also misappropriated AEB's trade secrets by using them for its own commercial advantage without AEB's express or implied consent, as Fiserv procured any such consent by misrepresentation. By concealing Fiserv's security failures, Fiserv retained AEB's business and the fees that came with it, and avoided the cost of the controls it had represented were in place. Further, Fiserv is seeking to levy termination-related fees and "deconversion" fees before

Fiserv will dispossess itself of AEB's trade secrets so that AEB can remove its trade secrets from Fiserv's custody to ensure they are properly secured.

155. Upon information and belief, Fiserv also misappropriated AEB's trade secrets by using and disclosing them without AEB's consent—consent Fiserv procured by misrepresentation—including by exposing them on insecure systems and, through the security failures described above, disclosing them to hackers.

156. At the time of Fiserv's use and disclosure of AEB's trade secrets, Fiserv knew or had reason to know that it acquired the trade secrets by improper means, under circumstances giving rise to a duty to maintain their secrecy or limit their use, from or through a person who had a duty to AEB to maintain the trade secrets' secrecy and limit their use, or by mistake prior to a material change of Fiserv's position.

157. Fiserv misappropriated AEB's trade secrets for its own commercial advantage: by concealing its security failures, Fiserv retained AEB's business and the fees that came with it, and avoided the cost of the controls it had represented were in place. Further, Fiserv is seeking to levy termination-related fees and "deconversion" fees in order for AEB to remove its trade secrets from Fiserv's custody to ensure they are properly secured.

158. Fiserv's acts constitute violations of the Ohio Uniform Trade Secrets Act, Ohio Revised Code § 1333.61, *et seq.*

159. Fiserv's misappropriation was willful and malicious, entitling AEB to punitive and exemplary damages under Ohio Revised Code § 1333.63(B) and reasonable attorneys' fees under Ohio Revised Code § 1333.64(C).

160. As a direct and proximate result of Fiserv's misappropriation of AEB's trade secrets, AEB has suffered and will continue to suffer irreparable harm and damages, including its actual losses and Fiserv's unjust enrichment.

## JURY TRIAL DEMAND

AEB requests a trial by jury of all issues so triable.

## DEMAND FOR RELIEF

WHEREFORE, AEB respectfully requests that the Court enter final judgment on the Complaint in favor of AEB and against Defendants and grant the following relief:

(i) **Monetary damages**, including damages for AEB's actual loss, damages for Fiserv's unjust enrichment or, in the alternative, a reasonable royalty, and exemplary damages for Fiserv's willful and malicious misappropriation—all in amounts to be determined at trial;

(ii) **Preliminary and permanent injunctive relief** protecting AEB against additional harm, including but not limited to injunctions requiring the performance of affirmative acts in order to protect AEB's trade secrets, as authorized under 18 U.S.C. § 1836(b)(3)(A)(ii) and/or Ohio Revised Code § 1333.62(C);

(iii) **Costs of litigation**, including, without limitation, AEB's attorneys' fees and costs, and the maximum prejudgment and post judgment interest allowed by law; and

(iv) **Such further relief as the Court deems just and proper**.

Dated: October 9, 2026

Respectfully submitted,

*/s/ Mathew A. Parker*

Mathew A. Parker
Allison R. Thomas
Jessica L. Gillis
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Key Bank Building
88 East Broad Street, Suite 2025
Columbus, Ohio 43215
614.494.0420
mathew.parker@ogletree.com

allison.thomas@ogletree.com
jessica.gillis@ogletree.com

Charles J. Nerko*
John C. Cleary*
Walter E. Swearingen*
NERKO PLLC
1178 Broadway, 3rd Floor
New York, New York 10001
518.363.9100
cnerko@nerko.com
jcleary@nerko.com
wswearingen@nerko.com

Lori G. Feldman*
Tiffany Wong*
HECHT PARTNERS LLP
125 Park Avenue, 25th Floor
New York, New York 10017
212.851.6821
lfeldman@hechtpartners.com
twong@hechtpartners.com

*Attorneys for Plaintiff*
*The Antwerp Exchange Bank Company*

* Admission to practice in this Court or admission *pro hac vice* forthcoming